**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **ROBERT G. MARCELLUS,** *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 3:15-cv-00481** |
| | ) | |
| **VIRGINIA STATE BOARD OF ELECTIONS,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants the Virginia State Board of Elections and each of its members (James B. Alcorn, Clara Belle Wheeler, and Singleton McAllister, in their official capacities as Chairman, Vice-Chairman, and Secretary, respectively) (collectively, the Commonwealth) state as follows in opposition to the Plaintiffs' Motion for Preliminary Injunction (the Motion) (docket # 3).

**ISSUES**

Laches bars preliminary injunctive relief when a plaintiff inexcusably delays bringing suit, thereby causing prejudice. The current form of the statutory bar on local candidate party affiliations on the ballot has existed since 2000. The candidate Plaintiffs could have brought suit on May 21, 2015, and the local party committee Plaintiff could have sued much earlier. Yet Plaintiffs delayed suit until August 17, only one month before the deadline to have ballots printed and ready for absentee voting. The Commonwealth and localities face significant burdens because of Plaintiffs delaying suit until the ballot design, approval, and printing process was well underway. Under these circumstances, are Plaintiffs entitled to the equitable remedy of preliminary injunctive relief?

The Supreme Court has stated that the First Amendment does not give political parties

the right to have their nominees designated as such on the ballot because ballots are not forums for political expression.  Plaintiffs, a local party committee and its favored candidates, seek to compel the Commonwealth to print such an expressive message of party affiliation on the ballot. Are the Plaintiffs likely to succeed on the merits?

Between now and the November 3, 2015 election, Plaintiffs remain free to speak in countless ways about anything they wish, including the affiliation between candidates and the Republican Party.  Any voter confusion that may exist is not attributable to the Commonwealth and can be corrected through normal campaign activities, but changing ballots for the election at this late date would impose significant administrative burdens and disrupt the electoral process. Have the Plaintiffs made a clear showing that the remaining factors in the preliminary injunction analysis – irreparable harm, balance of hardships, and the public interest – favor granting an injunction?

## SUMMARY OF FACTS

### The basis for Plaintiffs' claims

Plaintiffs Marcellus, Williams, Hodge, and Gresham (the Candidate Plaintiffs) are candidates for seats on the Board of Supervisors of Powhatan County.  They were nominated on May 21, 2015, under the Republican Party of Virginia's rules, by a method selected by Plaintiff Powhatan County Republican Committee (the Local Party Committee) and certified as candidates by the chairman of that Local Party Committee.  (Compl. ¶¶ 4, 9.)

The Candidate Plaintiffs are eligible to appear on the ballot for the offices they seek. (Compl. ¶ 7.)  There is no ballot access issue:  they will appear on the November 3, 2015 ballot. *See* Compl. ¶ 10; Decl. of Robert G. Marcellus (docket # 3, Ex. A) ¶ 25.

Plaintiff Marcellus is challenging an incumbent, Larry Nordvig,  who was the Republican

nominee in a February 2015 special election.  Decl. of Robert G. Marcellus (docket # 3, Ex. A) ¶¶ 4-5.  In May 2015, after disagreements within the local party developed, Nordvig withdrew his bid to run as a Republican and qualified for the November 3, 2015 ballot as an independent candidate.  *Id.*  ¶¶ 23, 26.  Marcellus is concerned that, in the absence of party identifiers printed on the ballot, voters might be confused about whether Marcellus or Nordvig is the Republican candidate.  *See id.* ¶¶ 28, 32.

**The challenged Virginia law**

Va. Code § 24.2-613 permits a party affiliation (or identifier) to be printed on the ballot for party-nominated candidates "for federal, statewide, and General Assembly offices *only*" (emphasis added).  Virginia has declined to print party affiliations on the ballot for candidates for local offices for well over 100 years.  Prior to 2000, no party affiliations appeared on the ballot in Virginia, other than the narrow exception in Va. Code § 24.2-614 for candidates for President of the United States.  *See See* Ex. D-1 (Va. Code Ann., tit. 5, § 122 (1904)); Ex. D-2 (Va. Code Ann. § 24.215 (1950)); Ex. D-3 (Va. Code Ann. § 24.1-111 (1973 Repl. Vol.)); 2000 Va. Acts ch. 514, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?001+ful+CHAP0514 (amending the pertinent part of § 24.2-613 to its current form).  Accordingly, under long-standing Virginia law, the ballot itself will not include a party affiliation or identifier for the Candidate Plaintiffs.[1]

---

[1]   In different areas of Virginia, city charters (which are enacted and amended by the General Assembly) are also relevant to the party identifiers issue.  Some localities' charters allow local office candidates to be nominated by political parties under general state elections law, but other charters provide only for nomination by petition – *i.e.*, submitting the requisite number of signatures in the same nonpartisan manner as an independent candidate.  *Compare* City of Petersburg Charter § 2-3.1, *available at* http://law.lis.virginia.gov/charters/petersburg ("Candidates for the office of councilman may be nominated by petition or by general law") *with* City of Virginia Beach Charter § 3.02:1, *available at* http://law.lis.virginia.gov/charters/virginia-beach ("Candidates for council shall be nominated only by petition...").  Although the State Board of Elections has supervisory power over local elections officials, the Board's instructions do not have independent legal force in the same manner that regulations do; instead, instructions'

*(footnote continued on next page)*

**The process for the upcoming November 3, 2015 election and the effects of an injunction**

Pursuant to Va. Code § 24.2-612, local electoral boards must make ballots available for absentee voting no later than 45 days prior to an election. Because not all general registrars' offices are open on Saturday, September 19, absentee ballots for the November 3, 2015 general election must be available, and must be mailed to voters who have requested mail-in absentee ballots, no later than September 18. For absentee ballot requests received after the initial availability deadline, local officials must provide the voter with ballot materials within three business days of the request. *See* Va. Code §§ 24.2-706 & 24.2-612.

Va. Code 24.2-612 also requires general registrars to submit ballot proofs to the Department of Elections for verification, prior to printing paper ballots or programming the ballot formats for electronic voting equipment. General registrars may submit proofs for review at any time after the June primaries. Consistent with the Department's historic practices, the deadline for verification and approval is one week before the statutory ballot availability and mailing deadline – *i.e.*, September 11 for the November 3, 2015 general election. *See* Ex. D-4 (Cortés Decl.) ¶ 5.

As of close of business on Friday, August 21, 47 localities had submitted ballot proofs for verification and received Department approval. *See* Ex. D-4 (Cortés Decl.) ¶ 6.

Virginia has 133 localities (counties and independent cities), and many of those localities have local offices on the November 3, 2015 ballot. A preliminary injunction would require the Commonwealth to re-review revised ballots and to coordinate with hundreds of local Electoral Board members and General Registrars to ensure uniform and proper implementation of ballot

---

validity depends upon the law on which the instructions are based. The effect and method of implementation of an injunction (and instructions by the Board) would be uncertain, and may be contested, in localities that require petition nominating processes, and do not allow party-controlled nominating processes, for some local offices.

changes.  *See* Ex. D-4 (Cortés Decl.) ¶ 7.

  The preliminary injunction requested by Plaintiffs also would impose burdens on local election officials.  Local electoral boards and general registrars are responsible for coordinating the preparation and printing of ballots and other elections logistics in their locality.  *See* Va. Code §§ 24.2-109(B) & 24.2-114.  Voting systems and ballot preparation processes vary between localities, so the time and steps required to prepare and print ballots are not uniform. The preparation and printing (or voting system programming) process involves particular vendors and specialized software and printing needs, including time to dry mail-in absentee ballots prior to folding so that smearing of the ink does not render them unreadable by optical scan voting systems.  Due to such specialized and detailed needs, a locality generally will require a week or more to prepare and print ballots, plus additional time for ballot design and approval from the Department of Elections.  *See* Ex. D-4 (Cortés Decl.) ¶¶ 8, 9, 11-13.

  The burdens that a preliminary injunction would impose on localities are substantial.  In Fairfax County, for example, there are 241 voting precincts and multiple local offices on the ballot, requiring 76 unique ballot styles.  Ex. D-5 (Flaig Decl.) ¶ 5.  Due to its size and election preparation needs, Fairfax already printed its ballots, at a cost of over $94,000.  *Id.* at ¶ 13. Revising the ballots now would require changes to each of the 76 ballot styles, and some candidate names are too long to allow simply putting the party identifier after the name, creating further design issues.  *Id.* at ¶ 15; *see* State Board of Elections, Ballot Standards and Verification Procedures (Rev. 8/2014) at p.4, *available at* https://voterinfo.sbe.virginia.gov/FormWarehouse/ Docs/Election+Management/Ballots/SBE%20Ballot%20Standards%20and%20Verification%20 Procedures.pdf.  After re-design of the ballots, Fairfax would be required to re-order hundreds of thousands of paper ballots from its printing company – likely at a higher cost – and to re-

program approximately 1,000 thumb drives for electronic voting systems, a time-consuming task.  Ex. D-5 (Flaig Decl.) ¶¶ 9, 15-16.

Even for localities, like Virginia Beach, that are not as far along in the process, an injunction would require reengaging in the ballot design process for 13 different ballot styles. Such reengagement would entail additional costs from the vendor and delay printing.  *See* Ex. D-6 (Patterson Decl.) ¶¶ 5, 10, 14.

## ARGUMENT

**I.     Standard of review**

**A.     Plaintiffs argue an outdated standard of review that may not be applied.**

To justify the extraordinary remedy of a preliminary injunction, Plaintiffs must show that (1) Plaintiffs are "likely to succeed on the merits"; (2) Plaintiffs "will likely suffer irreparable harm absent an injunction"; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

Although Plaintiff's Memorandum cites *Winter* initially, the rest of the brief disregards the *Winter* standard.  Instead, Plaintiffs substitute the more lenient standard of *Blackwelder Furniture Co., Inc. v. Seilig Mfg. Co. Inc.*, 550 F.2d 189 (4th Cir. 1977), under which a plaintiff might obtain an injunction merely by raising serious questions, and under which the balancing of hardships might influence or overshadow the likelihood of success.  *See* Plaintiffs' Rev. Mem., docket # 7, at 4 ("The test is not whether they are more likely to prevail than not….").

*Blackwelder* has not been good law since *Winter*.  As the Fourth Circuit explained in *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009), *vacated on other grounds by* 559 U.S. 1089 (2010) *and reissued in pertinent part by* 607 F.3d 355 (4th Cir. 2010),

"[o]ur *Blackwelder* standard in several respects now stands in fatal tension with the Supreme

Court's 2008 decision in *Winter*." 575 F.3d at 346. Among other things, a balancing of

hardships is no longer the first step of the analysis, and even a balance that strongly favored

Plaintiffs – which does not exist in this case – would not result in any lesser standard than a clear

showing of likelihood of success on the merits. *Id.* at 346-47.

The Fourth Circuit was clear about the bottom line: "the *Blackwelder* balance-of-hardship

test may no longer be applied in granting or denying preliminary injunctions in the Fourth

Circuit, as the standard articulated in *Winter* governs..." *Real Truth About Obama*, 575 F.3d at

347. As shown *infra*, Plaintiffs do not meet that "far stricter" standard. *Id.* at 347.

**B.      Plaintiffs seek a mandatory injunction that would order changes in the electoral process just before an election.**

Two further points related to the standard of review are material to this case.

First, a mandatory injunction, which disturbs the status quo ante, "in any circumstance is

disfavored" and should be issued "only in the most extraordinary circumstances." *League of

Women Voters of N.C.*, 769 F.3d at 236; *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir.

1994). Here, Plaintiffs ask this Court to require the Commonwealth and its localities to change

their ballots to add local candidate party affiliations. The injunction sought is plainly mandatory.

Second, Plaintiffs seek to alter the rules governing an election just before that election.

Courts "should pay *particular regard* for the public consequences in employing the

extraordinary remedy of injunction." *Real Truth About Obama*, 575 F.3d at 347 (quoting *Winter*,

555 U.S. at 24 (emphasis added by the Fourth Circuit)). As discussed *infra*, the public interest

weighs strongly against court-ordered changes in elections procedures just before an election.

**II.      Laches bars preliminary injunctive relief.**

Laches is an affirmative defense to equitable relief that has two elements: "(1) lack of

diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Perry v. Judd*, 840 F. Supp. 2d 945, 953 (E.D. Va. 2012), *affirmed by* 471 Fed. Appx. 219 (4th Cir. 2012). Laches "applies with particular force in the context of preliminary injunctions against governmental action, where litigants try to block imminent steps by the government." *Id.* at 950 (citing cases).

A.      **Plaintiffs' unjustified delay and lack of diligence**

The Candidate Plaintiffs were nominated on May 21, 2015. (Compl. ¶ 4.) It is inescapable that they could have brought this case then. The Local Party Committee, which nominated Nordvig in February 2015 and presumably existed in prior years, could have brought this suit months – or years – earlier. After all, Virginia law has barred printing party affiliation for local office candidates on the ballot for many years – and more than 15 years in the law's current form. Yet Plaintiffs waited to sue until August 17, during the period when ballots are being finalized, a mere one month before the statutory ballot deadline.

The closest thing to a justification for their delay that Plaintiffs offer is Marcellus's assertion that it "had not occurred to" him that Virginia law does not permit party identifiers for candidates for local office on the ballot. Decl. of Robert G. Marcellus (docket # 3, Ex. A) ¶ 33. But even if all of the Plaintiffs were unaware of the long-standing Virginia law at issue, they may not claim ignorance as an excuse. *King v. Empire Collieries Co.*, 139 S.E. 478, 479 (Va. 1927) (unless the legislature makes an exception, "ignorance of the law is no excuse, and everyone is conclusively presumed to know the law," and a litigant "is estopped from denying such knowledge"); *accord United States v. Moore*, 586 F.2d 1029, 1033 (4th Cir. 1978) ("The rule that 'ignorance of the law will not excuse' … is deep in our law.") (quoting *Lambert v. California*, 355 U.S. 225, 228 (1947)).

### B.      Prejudice resulting from Plaintiffs' delay in filing suit

"Prejudice can be inferred simply from the plaintiff's delay" and "[t]he greater the delay, the less the prejudice required to show laches." *Perry*, 840 F. Supp. 2d at 954.

In an elections context, prejudice naturally follows from unjustified delay because "[b]ringing lawsuits on the eve of pending elections disrupts the electoral process." *Miller v. Brown*, 462 F.3d 312, 320 (4th Cir. 2006).

Although the limited time available makes it impossible to survey all Virginia localities, the evidence shows that an injunction at this point would prejudice the Commonwealth and all affected localities by imposing significant administrative burdens, and would "disrupt[] the electoral process." *Miller*, 462 F.3d at 320.  *See supra* at pp. 4-6; Ex. D-4 (Cortés Decl.) ¶¶ 7, 15; Ex. D-5 (Flaig Decl.) ¶ 16; Ex. D-6 (Patterson Decl.) ¶¶ 10, 14.  Opposing counsel's repeated representations to the Court that altering ballots within the month before the absentee ballot deadline would require only "a couple of keystrokes" (at the August 24 status conference), "a minor administrative adjustment" (Plaintiffs' Rev. Mem. at 12) or "[a] simple software modification" (*id.*) are clearly erroneous and misleading.

As this Court wrote in *Perry*, where a litigant "knew the rules in Virginia many months ago" and "could have challenged the Virginia law at that time" but instead "on the eve of the printing of absentee ballots … decided to challenge Virginia's laws," laches bars a preliminary injunction.  840 F. Supp. 2d at 949.  Other federal courts likewise have denied injunctive relief before an election based on laches, citing prejudice similar to the prejudice in this case.  *See, e.g.*, *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (holding that a candidate for President was "not entitled to [the] equitable relief" of having his name placed on the state's May 20th presidential primary ballot "as a result of laches" where the candidate filed suit on March 31 after "all the

necessary preliminary work had been done for the paper ballots, voting machine strips, and punch cards"); *McClafferty v. Portage Cnty. Bd. of Elections*, 661 F. Supp. 2d 826, 839-41 (N.D. Ohio 2009) (denying preliminary and permanent injunctive relief sought against the balloting of an ordinance amendment on the ground that the challenge was "likely barred by the doctrine of laches" as "[v]oting machines ha[d] been programmed and 'locked down,' paper ballots for the absentee voters ha[d] been printed, and printed ballots for absent members of the armed forces ha[d] already been mailed."); *Libertarian Party of Conn. v. Bysiewicz*, no. 3:08-cv-1513, 2008 U.S. Dist. LEXIS 97970, at *27-31 (D. Conn. Dec. 2, 2008) (denying a motion for preliminary injunction to have plaintiff-candidates' names placed on a general election ballot because the claim "would be barred by the defense of laches" on the ground that the motion was not filed until two and a half weeks before the election, after election preparations had been completed); *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 187-88 (D. Me. 2008) (denying a motion for preliminary injunction to have a candidate's name appear on the ballot for the United States Senate because the challenge to the nomination petition process was barred by laches when presented nearly two months before the election, after "the printer had already begun the ballot printing process"); *cf. Herndon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (affirming the denial of a recount based on a challenge to the constitutionality of certain state ballot regulations on the ground that the challengers failed to perform their "duty … to bring their complaints forward for pre-election adjudication").

Although the Supreme Court has not fully explained several 2014 elections orders concerning lower courts' award of election-related injunctive relief, there is good reason to believe that the Supreme Court too endorses judicial forbearance, rather than ordering changes in

state election rules and processes shortly before elections.[2]  *See also Frank v. Walker*, 769 F.3d

494, 497 (7th Cir. 2014) (per curiam) (discussing *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and

noting: "There is a profound difference between compelling a state to depart from its rules close

to the election (*Purcell*) and allowing a state to implement its own statutes (this case).").

Plaintiffs' delay in filing suit necessitates last-minute adjudication and decision of their

claims, causing substantial uncertainty and, if an injunction were issued, burdens and disruption

for the Commonwealth and its affected localities.  If party identifiers must be added to the ballot

for candidates for local office, the 47 localities that have already had their ballots reviewed and

approved would need to resubmit them, and the Commonwealth would need to re-review them.

Ex. D-4 (Cortés Decl.) ¶¶ 5-7.  Localities that have printed their ballots would need to reprint

them.  Use of printed ballots is greater this election than in previous years (Ex. D-4 (Cortés

Decl.) ¶ 16; Ex. D-6 (Patterson Decl.) ¶ 8), and some localities have already printed ballots.

Ex. D-5 (Flaig Decl.) ¶¶ 13-14.  Even with electronic voting systems, adding party identifiers

would require substantial ballot redesign and system reprogramming.  *Id.* ¶ 15.[3]   Candidates and

---

[2]   A leading election law commentator has explained that "there is a consistent theme in the
court's actions, which we can call the '*Purcell* principle' after the 2006 Supreme Court case
*Purcell v. Gonzalez*: Lower courts should be very reluctant to change the rules just before an
election, because of the risk of voter confusion and chaos for election officials."  Richard L.
Hasen, "How to Predict a Voting Rights Decision" (Oct. 10, 2014) *at*
http://www.slate.com/articles/news_and_politics/jurisprudence/2014/10/supreme_court_voting_r
ights_decisions_contradictions_in_wisconsin_ohio_north.html (last visited Aug. 23, 2015).  The
remarks of dissenting justices in response to the Court's 2014 orders support Professor Hasen's
analysis.  *E.g.*, *Frank v. Walker*, 574 U.S. ___, 135 S.Ct. 7 (2014) (Alito, J., dissenting, joined by
Scalia, J. & Thomas, J.) (conceding that "There is a colorable basis for the Court's decision due
to the proximity of the upcoming general election."); *Veasey v. Perry*, 574 U.S. ___ , 135 S. Ct.
9, 10 (2014) (Ginsburg, J., dissenting, joined by Sotomayor, J., & Kagan, J.) ("in *Purcell* and in
recent rulings on applications involving voting procedures, this Court declined to upset a State's
electoral apparatus close to an election.").

[3]   Plaintiffs contend that localities that have already designed, obtained approval for, and printed
ballots have acted rashly.  The meager support they offer for that uninformed assertion is an

*(footnote continued on next page)*

voters who have formed electoral expectations based on Virginia's longstanding practice of not printing party identifiers on the ballot for candidates for local office would have those expectations upset.

Plaintiffs have not offered adequate justification for disrupting the Commonwealth's electoral processes at the last minute and imposing the above burdens on elections officials.[4] This Court should rule that laches bars preliminary injunctive relief.

Plaintiffs also have not met *Winter*'s demanding standard.

## III.    Plaintiffs are not likely to succeed on the merits.

Whether viewed through a First Amendment or Equal Protection lens, the issue on the merits comes down to whether Plaintiffs have a right to require the Commonwealth to alter its electoral process and print an associative message – a party identifier – on the ballot for local office candidates.  Unfortunately for Plaintiffs, the Supreme Court has twice rejected parties' claims that they have a right to identify with candidates on the ballot, and states may distinguish

---

August 19 email from a state elections staffer, Reiko Doḡu, to all general registrars, recommending that localities wait as long as possible to finalize their ballot.  *See* Ex. D-7.  As that email plainly indicates, the recommendation was based on the possibility of candidate withdrawals, referenda, or other ordinary changes, which normally take place by mid-August and some of which do not always necessitate ballot changes.  (The Board has authority to direct localities regarding the appropriate response, which is not always to delay or reprint the ballots, when a candidate who has qualified for the ballot dies, withdraws, or is disqualified.  *See* Va. Code § 24.2-612.1.)  Ms. Doḡu's email recommendation is not a binding instruction from the Board and does not purport to express judgment about when the circumstances in a particular locality favor or require proceeding with necessary ballot preparation.  The Board and the Department allow localities to submit ballots for approval at any time after the June 9 primary and candidate filing deadline.  Ex. D-4 (Cortés Decl.) ¶ 5.  A locality that decides to proceed with ballot design and printing before the last possible minute does so with knowledge of the possibilities and based on the needs of their locality.  *See* Ex. D-5 (Flaig Decl.) ¶ 10.

[4]   Plaintiffs' timing of this lawsuit also burdens the Court by forcing a decision on their preliminary injunction motion within a month, despite the Fourth Circuit's warning that "[p]roviding only thirty days for briefing, argument, and decision of a novel constitutional question before the courts is troublesome."  *Miller*, 462 F.3d 312, 320.

between offices with respect to printing party identifiers on the ballot.

**A.      The Commonwealth is entitled to broad deference in regulating elections so long as it does not severely burden a party's constitutional rights.**

The Constitution of Virginia provides that "[t]he General Assembly shall provide for the nomination of candidates, shall regulate the time, place, manner, conduct, and administration of primary, general, and special elections, and shall have power to make any other law regulating elections not inconsistent with this Constitution."  Va. Const. art. II § 4.  The United States Constitution likewise expressly recognizes state legislatures' right to regulate elections, even for federal offices.  *See* U.S. Const. art. I § 4 ("The Times, Places and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof.").[5] The Supreme Court long ago said that it "cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections."  *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *accord Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008) (the States' "broad power" to regulate elections for federal offices "is matched by state control over the election process for state offices").

**B.      Parties, and candidates, have no right to use the ballot to express an affiliation message.**

In *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), a party challenged a Washington initiative that cut off their ability under state law to indicate their nominees on the ballot.  The Court stated directly that the loss of that ability to identify with candidates on the ballot "is unexceptionable: **The First Amendment does not give political parties a right to have their nominees designated as such on the ballot.**"  *Id.* at 453 n.7

---

[5]   Indeed, election regulation is "one of the few areas in which the [U.S.] Constitution expressly requires action by the States" and contains an "express delegation[] of power to the States to act."  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995).

(emphasis added).  The Court explained that, even where the State allows some references to parties on a ballot (such as Washington "afford[ing] candidates the opportunity to indicate their party preference on the ballot"), parties had no right to compel the State to convey their message on the ballot.  *Id.*  "Ballots serve primarily to elect candidates, not as forums for political expression."  *Id.*

The Supreme Court also rejected party claims of a right to express affiliation on the ballot in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).  In *Timmons*, a party challenged Minnesota's "fusion ban."  The Court acknowledged that "[i]t is true that Minnesota's fusion ban prevents the New Party from using the ballot to communicate to the public that it supports a particular candidate who is already another party's candidate."  *Id.* at 362.  The Court rejected the claim that this was a severe burden on the party's rights, stating: "[w]e are unpersuaded, however, by the party's contention that it has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate."  *Id.* at 362-63.

There is no question that parties and candidates have a right to affiliate with each other and to spread that message of affiliation through any legal means.  But they do not have the right to turn the ballot – a highly-regulated, government-controlled, critical electoral tool – into a forum for expression, nor to force the Commonwealth to convey their affiliation message.  *See Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 230 (4th Cir. 2013) (listing "an election polling place" as a nonpublic forum); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. ___, 135 S. Ct. 2239, 2253 (2015) ("just as Texas cannot require SCV to convey 'the State's ideological message,' SCV cannot force Texas to include a Confederate battle flag on its specialty license plates") (citation omitted).

In light of *Washington State Grange* and *Timmons*, the older 6th Circuit case upon which Plaintiffs rely heavily (*Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992)) has lost whatever persuasive value it may once have had.  *Rosen* also presented a context that is significantly different than in Virginia: Ohio discriminated among candidates for the same office – printing party identifiers for major party candidates but declining to identify independent candidates, which put independent candidates at a disadvantage and evidenced intentional discrimination against non-major party candidates.  *See Rosen*, 970 F.2d at 177.  By contrast, Virginia does not discriminate between candidates for the same office, and the long-standing rule against party identifiers for local office candidates does not advantage some political parties over others.[6]

**C.     The Constitution does not bar the Commonwealth from listing candidate party identifiers on the ballot for some offices but not for others.**

Applying the *Anderson/Burdick* approach, the Commonwealth's important regulatory interests justify refusing to print party identifiers for local office candidates on the ballot.

**1.     Standard of review**

Courts evaluate the constitutionality of statutes governing elections using an approach established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and modified in *Burdick v. Takushi*, 504 U.S. 428 (1992).  The *Anderson/Burdick* approach provides that:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against the "precise

---

[6]   *Rosen* does not stand for the proposition that including party identifiers in one section of a ballot requires their inclusion throughout the ballot.  *See Ohio Council 8 American Fed. of State, County, and Municipal Employees, AFL-CIO, et al. v. Brunner, et al.*, 24 F.Supp. 3d 680 (S.D. Ohio 2014), *appeal pending as 6th Cir. case no. 14-3678.*  Instead, the *Ohio Council 8* court noted the distinction between a state permitting only certain party affiliations and a state permitting party identifiers only for candidates for certain offices.  The court concluded that "while the Sixth Circuit has not decided the precise issue, its precedent leads this Court to conclude that so long as Ohio treats all judicial candidates equally, it need not treat them in the same manner that it treats candidates for other offices."  *Id.* at 690.

> interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434 (citing *Anderson*, 460 U.S. at 789, and another case).

*Clingman v. Beaver*, 544 U.S. 581 (2005), further refined the approach to clarify the distinction between regulations that impose a severe burden and those that do not:

> Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest.  However, when regulations impose lesser burdens, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."

*Id.* at 586-87 (citations omitted).

## 2.      There is no severe burden on Plaintiffs' rights.

Plaintiffs have not shown a severe burden on their associational rights, given the rejection of a right to have a party identifier on the ballot in *Washington State Grange* and *Timmons*.[7] Moreover, Plaintiffs remain free to use any legal means to convey whatever messages they wish to convey about particular candidates and the Republican Party.  *See* § IV, *infra.*

## 3.      Section 24.2-613 advances legitimate state interests and does not irrationally or impermissibly discriminate in declining to print party identifiers for candidates for local offices.

Va. Code § 24.2-613 serves "important regulatory interests" in minimizing partisanship in local offices (including allowing local offices to be officially nonpartisan), attempting to ensure that as many citizens are eligible to hold local office as possible (under the Hatch Act), and promoting impartial local governance and administration of law.

There are many local offices in Virginia, as the ballot specimens attached to the Declaration of Commissioner Cortés (Exs. B – D thereto) reflect.  A number of local offices are

---

[7]   In fact, at the August 21, 2015 status conference, Plaintiffs' counsel conceded that strict scrutiny was not the applicable standard in this case.  Given the applicable standard, that concession represents an admission that the alleged burden Plaintiffs suffer is not severe.

constitutionally created, including county and city treasurers, sheriffs, Commonwealth's attorneys, clerks of court, and commissioners of revenue. *See* VA. CONST. art. 7, § 4. Local officers perform critical governmental functions. Some – such as clerks of court – are judicial officers. Others are quasi-judicial or perform duties that should be performed in a nonpartisan, impartial manner (Commonwealth's attorneys, sheriffs, treasurers, and commissioners of the revenue). Local offices differ from "federal, statewide, and General Assembly offices" in important respects that are related to and justify the Commonwealth's interests.

The Commonwealth has an interest in ensuring the impartial execution of its laws. This governmental interest was recognized in *United States Civil Service Commission, et al. v. National Association of Letter Carriers, AFL-CIO, et al.*, 413 U.S. 548 (1973), as so critical that it was dubbed a "great end of Government." *Id.* at 565. Va. Code § 24.2-613 serves that interest by minimizing official sanction of partisanship in local office elections.[8]

The *Letter Carriers* case addressed the constitutionality of the federal Hatch Act, which limits federal employees' involvement in certain partisan activities. The Hatch Act bars federal employees from being candidates for public office in partisan elections, but federal employees may be candidates in nonpartisan elections. *See* 5 U.S.C. § 7323(a)(3); 5 C.F.R. § 734.203(b). *See generally* Office of Special Counsel, Advisory Opinion (Nov. 18, 2009), *available at* https://osc.gov/Resources/HAFederalAdvOpinion11-18-09.pdf (last visited Aug. 28, 2015). The Commonwealth has approximately 172,500 federal employees among its citizens,[9] and many

---

[8]  As local elected officers in Virginia must display impartiality in the performance of their duties to ensure citizen confidence in local government, the interests considered by the Court in *Letter Carriers* are active and applicable in this context as well.

[9]  *See* Governing.com, Federal Employees by State, *at* http://www.governing.com/gov-data/federal-employees-workforce-numbers-by-state.html (last visited Aug. 28, 2015) (citing 2013 Bureau of Labor Statistics data).

Virginia municipalities contain or are near major federal installations. Ex. D-8 (Flynn Decl.) ¶ 4. Virginia has an important interest in attempting to ensure that as many citizens may serve in local offices as possible. Obviously there are First Amendment limits on banning partisan activities or affiliations with respect to local offices. But what Virginia can do, and what § 24.2-613 does, to promote the State's interest in a broad pool of potential officeholders is allow local office elections to be officially nonpartisan.[10]

Similarly, Virginia has an important interest in ensuring that local officers do not present even an appearance of "practicing political justice," to avoid the erosion of confidence in local governments. *Letter Carriers*, 413 U.S. at 565. Parties are free to nominate or endorse candidates, and candidates to associate with a party sharing their political views. However, the Commonwealth has concluded that it does not wish to promote partisanship by identifying local office candidates by party on the general election ballot because, once elected, public confidence in officially partisan officeholders may be undermined or those officers may not be able to effectively fulfill their duties if they are fully subject to partisan pressures and influences. *See* Ex. D-8 (Flynn Decl.) ¶ 4 (the Virginia Municipal League has an interest in "ensur[ing] that members of the governing bodies of Virginia's cities and towns serve to advance their localities and not to advance any political groups"). As was noted in *Letter Carriers*, certain offices cannot function effectively when even the appearance of "political justice" or partisan pressure on officials exists. 413 U.S. at 565-66.

Particularly with respect to the local officers that are judicial or quasi-judicial, the Commonwealth has an interest in minimizing official partisanship. This interest was recognized

---

[10]   As discussed above, whether local offices are fully nonpartisan in Virginia depends upon the provisions of law governing the candidate qualification process in the locality and for the office at issue. *See* n.1, *supra*; Ex. D-8 (Flynn Decl.) ¶ 4..

in the judicial context in *Ohio Council 8 American Federation of State, County, and Municipal Employees, AFL-CIO, et al. v. Brunner*, 24 F.Supp. 3d 680 (S.D. Ohio 2014), *appeal pending as 6th Cir. case no. 14-3678*.  In *Ohio Council 8*, the district court acknowledged that "judicial elections differ from legislative elections," *Id.* at 690 (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 194 (6th Cir. 2010)), much like the elections at issue in this case differ from statewide elections. Ohio law permitted party nomination and endorsement of judicial candidates, but mandated a nonpartisan ballot for judicial candidates in the general election.  The court concluded that Ohio's stated interest in diminishing reliance on partisanship in judicial elections "need only be 'legitimate' and 'reasonable' to outweigh Plaintiffs' interest in having party affiliation information on the ballot." *Id.* at 700 (citing *Timmons*, 520 U.S. 317, at 367).  The Court further noted that "[d]istinguishing judges from candidates running for political office on the general election ballot is a legitimate and reasonable way of advancing the goal of preserving the public's trust that the judge will abide by the rule of law and not partisan influence." *Id.*  As noted above, the Supreme Court in *Letter Carriers* also recognized the important governmental interest in ensuring that partisan influence does not outweigh (or even appear to outweigh) the rule of law in the performance of official duties.

The Commonwealth's legitimate and reasonable interests in minimizing partisanship (especially official sanction of partisanship) in local elections, attempting to ensure the broadest possible base of potential officeholders, and promoting impartial local governance and administration of law, outweigh the minimal (if any) burden that the prohibition of party identifiers on the ballot imposes on Plaintiffs' constitutional rights.

**IV.**    **Plaintiffs have not demonstrated that the challenged state law will cause irreparable harm without a preliminary injunction.**

Plaintiffs cannot prevail "based only on a possibility of irreparable harm."  *Winter*, 555

U.S. at 22.  Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

Plaintiffs have made no such clear showing.  As discussed in § III, *supra*, Plaintiffs have not shown that their constitutional interpretation is likely to prevail, so they have failed to show irreparable harm in the form of loss of constitutional rights.  And there is no clear showing of relevant voter confusion – *i.e.*, confusion about who to vote for because of the lack of party identifiers on the ballot for local office candidates.  Instead, Plaintiffs have offered speculation that, on Election Day, there will be an electorally-significant group of voters who are uninformed enough to be confused about who the Republican candidate is, yet savvy enough to draw erroneous conclusions about party affiliation by closely comparing the ballot's candidate listings for different offices.  *See* Plaintiffs' Rev. Mem., docket # 7, at 11.

Case law shows that such a confusion claim is insufficient.  In *Washington State Grange*, the printing of candidates' party preferences on Washington's ballot posed a greater risk of confusion than exists here, where Virginia's ballot contains no party identifiers at all for local office candidates and where external sources readily identify party affiliations.  The Supreme Court dismissed confusion concerns, stating that "'[o]ur cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues.'"  *Washington State Grange*, 552 U.S. at 454 (quoting *Tashjian*, 479 U.S. at 220).  Assertions about what some voters in the lead Plaintiff's district know months prior to the election – *see* Decl. of Robert G. Marcellus (docket # 3, Ex. A) ¶¶ 28, 32 – does not clearly show that voters will be unable to identify the Republican candidate, if that is important to them, when marking their ballots.

The mandatory injunction sought by Plaintiffs also does not satisfy the requirement that the irreparable harm and deteriorating circumstances at issue have been "created by" the

Commonwealth.  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) ("[A]

mandatory preliminary injunction must be necessary both to protect against irreparable harm in a

deteriorating circumstance created by the defendant and to preserve the court's ability to enter

ultimate relief on the merits of the same kind.").[11]  To the contrary, the lead Plaintiff admits that

the Commonwealth's elections website accurately identifies Marcellus as the Republican

candidate.  Decl. of Robert G. Marcellus (docket # 3, Ex. A) ¶ 33; *see also* Ex. D-9 (a printout of

the Powhatan Board of Supervisors District 2 candidates, using the "What is on my ballot?" tool

on a state elections website), *available from* https://voterinfo.sbe.virginia.gov/PublicSite

/Public/FT2/PublicElections.aspx (last visited Aug. 27, 2015).  The true causes of any confusion

seem to be Nordvig's recent history as a Republican candidate and Nordvig's continued

association with Republican officials, through pictures and social media.  *See* Decl. of Robert G.

Marcellus (docket # 3, Ex. A) ¶ 31; Plaintiffs' Rev. Mem., docket # 7, at 13.  Those matters are

attributable to Nordvig, the Republican Party, and its officials – not to the Commonwealth.  Nor

is it clear that printing party identifiers on the ballot would redress whatever advantage Nordvig

may reap from such speech – an injunction will not stop Nordvig from spending all of the time

between now and Election Day "pos[ing] as a Republican candidate."  *Id.*[12]

---

[11]  Abrogation of the Fourth Circuit's *In re Microsoft Corp. Antitrust Litig.* decision on other
grounds was recognized in *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 Fed. Appx.
351, 354 (4th Cir. 2011) (unpublished).  Courts within the Fourth Circuit, including this Court,
continue to apply the quoted requirement as part of a skeptical approach toward requests for
mandatory preliminary injunctive relief.  *E.g.*, *Pro-Concepts, LLC v. Resh*, no. 2:12-cv-00573,
2013 U.S. Dist. LEXIS 151714 at 11 (E.D. Va. Oct. 21, 2013); *Calvary Christian Ctr. v. City of
Fredericksburg*, 800 F. Supp. 2d 760, 765 (E.D. Va. 2011).

[12]  Plaintiffs claim that an October 25, 2011 *Washington Post* article contains an admission of
voter confusion by a state elections employee, Matt Abell.  *See* Ex. D-10 at 1.  Plaintiffs are
wrong.  Even if we assume Mr. Abell was quoted accurately and leave aside that there is no basis
to bind the Commonwealth to Mr. Abell's statement, his statement plainly identifies voters being
perplexed about whether there was an error in the design of their ballot, in that party identifiers

*(footnote continued on next page)*

Last but not least, Plaintiffs have many tools at their disposal, prior to and on Election Day, to inform voters and correct any voter confusion.  *See Sarvis v. Judd*, no. 3:14-cv-00479, 2015 U.S. Dist. LEXIS 3968 (E.D. Va. Jan. 13, 2015) ("If candidates want the votes of uninformed voters, they should inform them.").  Parties can create and distribute sample ballots that clearly identify candidates who are affiliated with or endorsed by the party.  Candidates can engage in mailings, advertisements, and other political speech.  Campaign personnel can stand 40 feet outside the entrance to Powhatan polling places (*see* Va. Code § 24.2-310) with large signs identifying the Republican candidate(s) and with a cell phone or other tool to prove that fact for voters by reference to official elections websites.  It seems likely that normal campaign efforts of Marcellus and other Plaintiffs will significantly reduce any voter confusion that may exist now, especially as Election Day approaches and voters begin to pay closer attention.

Plaintiffs have failed to make a clear showing that irreparable harm will result without an injunction.

## V.      The balance of hardships favors the Commonwealth.

As detailed *supra* (at pp. 4-6) and in the attached declarations, an injunction at this late date would impose additional ballot design and printing costs on localities, require additional time and work from state and local personnel, and cause significant uncertainty and disruption in the electoral process.  Given that experienced local officials normally allot two weeks just for ballot printing – Ex. D-5 (Flaig Decl.) ¶ 16; Ex. D-6 (Patterson Decl.) ¶ 13 – and that ballot design and approval require time above and beyond the time allotted for printing, there is a real risk that absentee ballots would not be ready in all localities by the 45-day statutory deadline on

---

appear for candidates on part of the ballot but not on the rest.  Mr. Abell's statements do not admit or reflect any voter confusion about the candidate for whom they should vote.

September 18.  Ex. D-4 (Cortés Decl.) ¶ 15.  Any delay in absentee voting may impact the fundamental right to vote and thereby cause voter confusion and additional lawsuits.  And a critical electoral tool would be transformed into a forum for expression, in which the Commonwealth would be forced to convey a message that it does not wish to convey.

On the other hand, Plaintiffs face only a possibility of voter confusion, to which they add the conclusory assertion that such confusion will be substantial.  Moreover, any voter confusion can be addressed through normal campaigning activities such as sample ballots, mailing and advertisements, and targeted messaging outside polling places.  *See* § IV, *supra*.

The balance of hardships does not weigh in favor of granting a preliminary injunction.

## VI.      The public interest weighs against preliminary injunctive relief at this late date.

As discussed at the status conference on August 24, 2015, any injunction necessarily has statewide effect, for three reasons.  First, as a practical matter, if it is unconstitutional to refuse to print party identifiers on the ballot for local office candidates in Powhatan, it is likely unconstitutional in other localities too.  Second, the Board has an explicit statutory duty to "supervise and coordinate the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections."  Va. Code § 24.2-103(A).  It is inconsistent with that clear statutory mandate for the Board to allow non-uniform ballot content rules or to decide not to apply a constitutional ruling statewide.  Third, allowing a lack of uniformity among localities regarding ballots may raise serious and complex constitutional issues.  *See Bush v. Gore*, 531 U.S. 98, 104-08, 110 (2000) (per curiam).

Given that an injunction would have statewide effect upon the electoral process at an exceedingly late date, the public interest does not favor granting a preliminary injunction.  *See* § II(B), *supra* (discussing the recognition by the Supreme Court and lower federal courts of the

need for restraint in judicial alteration of the electoral process).  Moreover, the interaction

between an injunction and other relevant law – such as the Hatch Act and city charters that do

not permit party-controlled nomination processes for some local offices (*see* § III(C)(3) &  n.1,

*supra*) – would raise additional legal questions and disruption of Virginia's electoral process that

should not be rushed to resolution on an emergency basis.

As for the transparency rationale offered in Plaintiffs' Revised Memorandum (at 13-14),

Plaintiffs have failed to show that ballot alteration at this late date is necessary and appropriate to

better inform voters.  Parties, candidates, and voters have ample time and many other channels to

convey and receive affiliation messages.  It is improper to presume, as Plaintiffs do, that voters

will fail to inform themselves.  *See Washington State Grange*, 552 U.S. at 454 (rejecting claims

that voter confusion regarding candidate party affiliations would result and noting that "[o]ur

cases reflect a greater faith in the ability of individual voters to inform themselves about

campaign issues").  It also is improper to presume, as Plaintiffs do, that it is the

Commonwealth's responsibility, as opposed to the candidates', to inform the voters of party

affiliations.  *See Sarvis v. Judd*, no. 3:14-cv-00479, 2015 U.S. Dist. LEXIS 3968 at 15 (E.D. Va.

Jan. 13, 2015) ("If candidates want the votes of uninformed voters, they should inform them.").

## CONCLUSION

The Court should apply laches and deny preliminary injunctive relief, in light of

Plaintiffs' undue and prejudicial delay in bringing this suit.

In addition, the Court should conclude that Plaintiffs have not met the strict standard for

the extraordinary remedy of preliminary injunctive relief.  Plaintiffs have not made the required

clear showing that they are likely to prevail on the merits and would suffer irreparable harm

without an injunction.  The balance of hardships and public interest factors also do not weigh in

favor of Plaintiffs' request to change a long-standing Virginia law shortly before an election.

The Plaintiffs' Motion for Preliminary Injunction should be denied.

Respectfully submitted,

VIRGINIA STATE BOARD OF ELECTIONS
JAMES B. ALCORN
CLARA BELLE WHEELER
SINGLETON MCALLISTER

By:  _____/s/ - Joshua D. Heslinga_____
Counsel

Mark Herring
Attorney General of Virginia

Cynthia E. Hudson
Chief Deputy Attorney General

John W. Daniel II
Deputy Attorney General, Commerce, Environment and Technology Division

Heather Hays Lockerman
Senior Assistant Attorney General, Chief, Financial Law & Government Support Section

Joshua D. Heslinga (VSB # 73036)
Assistant Attorney General
jheslinga@oag.state.va.us

Anna T. Birkenheier (VSB # 86035)
Assistant Attorney General
abirkenheier@oag.state.va.us

*Attorneys for the Virginia State Board of Elections and its members in their official capacities*

Office of the Attorney General
900 E. Main Street
Richmond, Virginia 23219
(804) 786-3847
fax: (804) 692-1647

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on August 28, 2015, I am electronically filing the foregoing document with

the Clerk of Court using the CM/ECF system, which will serve such filing on counsel of record:

> Patrick M. McSweeney
> McSWEENEY, CYNKAR & KACHOUROFF, PLLC
> 3358 John Tree Hill Road
> Powhatan, Virginia 23139
> TeL (804) 937-0895
> patrick@mck-lawyers.com
> *Counsel for Plaintiffs*

>                         /s/
> Joshua D. Heslinga (VSB # 73036)
> *Attorney for the Virginia State Board of Elections*
> *and its members in their official capacities*
> Office of the Attorney General
> 900 E. Main Street
> Richmond, Virginia 23219
> (804) 786-3847
> fax: (804) 692-1647
> jheslinga@oag.state.va.us