IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROBERT G. MARCELLUS, *et al.*,

      Plaintiffs,

v.                                Civil Action No. 3:15cv481

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the Motion for Preliminary Injunction filed by Plaintiffs Robert G. Marcellus, David Williams, Barry Hodge, Timothy Gresham, and Powhatan County Republican Committee ("PCRC") (collectively, "Plaintiffs") pursuant to Fed. R. Civ. P. 65(a).[1] (ECF No. 3.) Defendants Virginia State Board of Elections ("SBE"), James B. Alcorn (Member and Chair), Clara Belle Wheeler (Member and Vice Chair), and Singleton B. McAllister (Member and Secretary) (collectively, "Defendants"[2]) filed a response in opposition, and Plaintiffs replied. (ECF Nos. 12–13.) On September 3, 2015, the Court heard oral argument. Accordingly, the matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[3] For the reasons that follow, the Court will deny the Motion for a Preliminary Injunction. Laches bars the requested relief.

---

[1] This Court "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1).

[2] Plaintiffs sued the three members of the SBE in their official capacities.

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs' claim that a Virginia statute regarding election procedures violates the Constitution invokes this Court's federal question jurisdiction.

## I. Factual and Procedural Background[4]

### A.    Factual History

#### 1.    The Challenged Statute

Plaintiffs challenge Va. Code Ann. § 24.2-613 (West 2015) ("Section 24.2-613") which provides that ballots in elections for "federal, statewide, and General Assembly offices only" can include a political party affiliation alongside a candidate's name. The current version of Section 24.2-613, which became effective January 1, 2001, states in relevant part:

> For elections for federal, statewide, and General Assembly offices only, each candidate who has been nominated by a political party or in a primary election shall be identified by the name of his [or her] political party. Independent candidates shall be identified by the term "Independent."

§ 24.2-613.[5] Plaintiffs ask this Court to declare Section 24.2-613 unconstitutional because they claim it violates their right to the freedom of association to advance shared political beliefs under the First[6] and Fourteenth[7] Amendments of the United States Constitution, and because it denies

---

[4] No disputes exist regarding much of the factual background in this case. The parties submitted agreed Stipulations of Fact in advance of the hearing. The Court adopts the agreed facts for purposes of this Motion for Preliminary Injunction. Both parties place declarations before the Court containing factual assertions and the basis for them. The Court applies the Federal Rules of Evidence in weighing those facts in the context of this Motion.

[5] The General Assembly enacted Title 24.2 of the Code of Virginia in 1993. 1993 Va. Acts Ch. 641. The 1993 version of Section 24.2-613 more broadly proscribed the placement of party affiliation on a ballot by allowing such identification to be listed only during presidential elections: "No names of political parties shall appear on the ballot, except as provided in § 24.2-614 for presidential elections." Va. Code Ann. § 24.2-613 (West 1993).
  On April 6, 2000, the General Assembly amended Section 24.2-613, effective January 1, 2001, to its current form. Va. Code Ann. § 24.2-613 (West 2001); 2000 Va. Acts 514.

[6] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

them their equal protection rights under the Fourteenth Amendment.  As to their request for a preliminary injunction, Plaintiffs seek:  (1) to enjoin Defendants from enforcing Section 24.2-613 in the upcoming November 3, 2015 General Election; and, (2) an order from this Court directing Defendants to identify Plaintiffs as Republican on the ballot.[8]  (Rev. Mem. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem. Supp.") 1, ECF No. 7.)

## 2.   The Powhatan Board of Supervisors Election

On May 21, 2015, PCRC nominated Marcellus, Williams, Hodge, and Gresham as Republican candidates for the Powhatan County Board of Supervisors.  (Pls.' Mem. Supp. Ex. A Decl. Robert G. Marcellus ("Marcellus Decl.") ¶ 3, ECF No. 3.[9])  Marcellus, Williams, Hodge, and Gresham "[have] properly qualified to be placed on the 2015 general election ballot."  (Stip. Fact ¶ 3, ECF No. 17; *see also* Marcellus Decl. ¶ 24.)  The Chair of PCRC ("the PCRC Chair") declared the Plaintiffs as the Republican nominees for the Powhatan County Board of Supervisors and provided this information to the SBE.

Plaintiff Marcellus challenges an incumbent, Larry Nordvig, who served as the Republican nominee for District 2 of the Powhatan County Board of Supervisors in the February 2015 special election.  In May 2015, after disagreements within the local party developed,

---

[7] "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

[8] During an August 24, 2015 status hearing, no party disputed that, if this Court were to issue a preliminary injunction, the requested relief would apply statewide.  No party offered a constitutional basis to limit the preliminary injunction to one locality, and this Court could find none.  The parties agree that this Court thus evaluates this case in the context of a statewide, mandatory, preliminary injunction, as discussed below.

[9] Plaintiffs did not attach Marcellus's Declaration to their Revised Memorandum in Support of their Motion for Preliminary Injunction.  The Court reviews the Declaration attached to the original motion.

Nordvig withdrew his bid to run as a Republican and qualified to run as an independent candidate on the November 3, 2015 General Election ballot. Marcellus challenges the lack of party identification on the ballot for his local election, asserting that he has "encountered voters in District 2 who are confused about which candidate is the Republican candidate for the Board of Supervisors in this district," noting that he knows numerous voters who wish to vote for the Republican candidate in order to support the Republican Party's agenda. (Marcellus Decl. ¶¶ 28, 32.)

Marcellus states that the Powhatan County General Registrar told him to consult the SBE website to confirm how his candidate information would appear. Marcellus initially declared that "[i]t had not occurred to me or voters that I have spoken to that my name would not be associated with "Republican" on the actual ballot as the State Board of Elections website so clearly delineated party affiliation for all candidates except school board." (Marcellus Decl. ¶ 33; *see also* Stip. Fact Ex. J-3.) Marcellus declares that he "relied on the [website] title, 'What's on My Ballot?'[10] as an accurate description of what in fact would be on the ballot." (Pls.' Reply Defs.' Mem. Opp'n Mot. Prelim. Inj. ("Pls.' Reply") Ex. P-1 Second Decl. Robert G. Marcellus ("2nd Marcellus Decl.") ¶ 4, ECF No. 13-1.)

Marcellus also attests that near the end July of 2015, a Republican candidate running for the Powhatan Board of Supervisors in a different district told Marcellus that "he was not certain that [Marcellus] was correct that party affiliation would be indicated on the ballot." (2nd Marcellus Decl. ¶ 7.) The "What is on my Ballot?" SBE website contains listings for "Office," "Jurisdiction," "Ballot Name," "Party," and "Web Site" [sic]. (Stip. Fact Ex. J-3.) The SBE website lists Marcellus as a Republican, Nordvig as an Independent, and shows a website address

---

[10] Marcellus refers to the SBE website as quoted above. The Court will use the actual heading on the website page: "What is on my Ballot?" (*See* Stip. Fact Ex. J-3.)

4

for each candidate. Marcellus swears that he did not learn from any "authoritative source" that party affiliation would not be on the ballot in his Board of Supervisors election until an SBE official confirmed that fact in an email sent to the other Republican candidate, which was forwarded to Marcellus on August 3, 2015.

Plaintiffs contend they did not delay in seeking this injunction because they filed suit two weeks after receiving the August 3, 2015 email exchange. Plaintiffs also argue that Defendants misled them because the SBE's "What is on my Ballot" website for the November 3, 2015 General Election identifies Plaintiffs' political party affiliations.

### 3. Virginia's Electoral System as it Relates to Ballots

The SBE has the responsibility and authority under Virginia law to supervise, coordinate and adopt regulations concerning the functions of local electoral boards and local general registrars. Va. Code Ann. § 24.2-103 (West 2015). Local electoral boards and general registrars are responsible for the design and printing of their respective ballots. (Stip. Fact ¶ 11; *see also* Defs.' Mem. Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n") Ex. D-4 Decl. Edgardo Cortes ("Cortes Decl.") ¶ 13, ECF No. 12-4 (noting that each general registrar "is responsible for coordinating the preparation and printing of ballots for his or her locality").) Virginia law requires local electoral boards and general registrars to provide information to the SBE regarding each local candidate who qualifies to be placed on the general election ballot for the respective jurisdiction. Virginia has 133 localities (counties and independent cities). Localities may begin submitting proofs for review and approval at any time following the June primaries.

State law directs the SBE and localities to make absentee ballots available and mail them to voters at least 45 days before the election ("the 45-day absentee ballot availability deadline"). Va. Code Ann. § 24.2-612 (West 2015) ("The electoral board shall make printed ballots

5

available for absentee voting not later than 45 days prior to any election . . . ."); Stip. Fact ¶ 12.

The 45-day absentee ballot availability deadline for the November 3, 2015 General Election is

Saturday, September 19, 2015. Localities that are not open on Saturdays must have absentee

ballots available on Friday, September 18, 2015. The deadline for localities to seek review and

approval of their ballots would be September 11, 2015.

In the event of death, withdrawal, or disqualification of a candidate who previously

qualified to be on the general election ballot, the SBE directs local electoral boards as to how to

proceed, taking into account time available, the locality's ballot printing capacity, and other

considerations. Va. Code Ann. § 24.2-612.1 (West 2015).[11] After September 18 or 19, 2015,

whichever applies, localities must make printed ballots for absentee voting available "within

three business days of the receipt of a properly completed absentee ballot application." § 24.2-

612.

**B.     Procedural History**

On Monday, August 17, 2015, Plaintiffs filed their Complaint for Declaratory Judgment

and Motion for Preliminary Injunction. On Tuesday, August 19, 2015, this Court ordered the

---

[11] Section 24.2-612.1 provides in pertinent part:

> In the case of the death, withdrawal, or disqualification of any candidate, other
> than a party nominee, who has qualified to have his [or her] name printed on the
> ballot for any election other than a presidential or primary election, the [SBE]
> shall take into account the time available before the election and the status of the
> ballots for the election and *shall have authority to direct the electoral boards on*
> *how to proceed to print the ballot without the candidate's name, correct the ballot*
> *to delete the candidate's name, or provide notice to voters of the death,*
> *withdrawal, or disqualification of the candidate.*
>
> The [SBE] shall have like authority in the case of the death, withdrawal, or
> disqualification of a party nominee subject to the provisions of Article 5 (§ 24.2-
> 539 et seq.) of Chapter 5 of this title.

Va. Code Ann. § 24.2-612.1 (West 2015) (emphasis added).

parties to appear for a status hearing on Monday, August 24, 2015 to address procedural matters, including "a sustainable schedule for full consideration of this matter, taking into account the November 3, 2015 General Election." (Aug. 19, 2015 O. ¶ 6, ECF No. 4.)  At the Monday, August 24, 2015 hearing, Plaintiffs requested a hearing and decision on the Motion for Preliminary Injunction not later than September 18, 2015, taking into account the 45-day absentee ballot availability deadline.  The Complaint and Motion for a Preliminary Injunction do not mention the 45-day absentee ballot availability deadline or the September 11, 2015 approval deadline, but the parties articulated those dates in their Joint Stipulations of Facts.

Consistent with the scheduled imposed at the August 24, 2015 status hearing, on Friday, August 28, 2015, Defendants filed their responses to the Motion for Preliminary Injunction, and on Monday, August 31, 2015, Plaintiffs replied.  On Thursday, September 3, 2015, the Court held a hearing on the Motion for Preliminary Injunction.

## II.  Standards of Review

### A.    Preliminary Injunction

"[A] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) ("*Perry II*") (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Such remedy is "never awarded as of right."  *Winter*, 555 U.S. at 24.  "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way."  *Hughes Network Sys. v. InterDigital Comm'cns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).  Therefore, preliminary injunctions are "to be granted only sparingly."  *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 590–91 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

In order to be eligible for a preliminary injunction,[12] the party seeking such relief must demonstrate each of the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest. *Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010).[13] Plaintiffs, as the party seeking a preliminary injunction, bear the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." *Winter*, 555 U.S. at 22. The failure to show any one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346.

"Ordinarily, preliminary injunctions are issued to 'protect the status quo and to prevent irreparable harm during the pendency of a lawsuit . . . [so as] to preserve the court's ability to render a meaningful judgment on the merits.'" *Perry II*, 471 F. App'x at 223 (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 525). However, mandatory preliminary injunctive relief that would alter the status quo, such as the action sought here, "is disfavored, and warranted only in the most extraordinary circumstances." *Id.* (citing *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 525). Plaintiffs, contrary to Section 24.2-613, ask this Court to change Virginia's balloting scheme by ordering that all November 3, 2015 General Election

---

[12] A decision to grant a preliminary injunction lies within the sound discretion of the district court. *Perry II*, 471 F. App'x at 223 (citation omitted).

[13] "Before the Supreme Court's decision in *Winter*, the standard articulated in *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), governed the grant or denial of preliminary injunctions in the Fourth Circuit." *Real Truth*, 575 F.3d at 346.

ballots include the party affiliation of candidates like Plaintiffs. Therefore, this Court's "application of th[e] exacting standard of review [for preliminary injunctions] is even more searching when the relief requested is mandatory rather than prohibitory in nature." *Id.* at 223–24 (alterations in original) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 525).

### B.   Constitutional Challenges to Election Laws in General:  The *Anderson/Burdick* Framework

When considering the first *Winter* factor, likelihood of success on the merits, the Court utilizes the framework articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) regarding Plaintiffs' constitutional challenges to Section 24.2-613. Recently, the Honorable Robert E. Payne provided a comprehensive explanation and application of the *Anderson/Burdick* framework when reviewing a constitutional challenge to a different Virginia election statute. *See Sarvis v. Judd*, 80 F. Supp. 3d 692, 697–99 (E.D. Va. 2015).[14]

In short, the *Sarvis* court noted that the *Anderson/Burdick* framework "holds that the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the party's rights." 80 F. Supp. 3d at 698 (citation omitted). The *Sarvis* court noted that the extent to which a challenged regulation burdens constitutional rights determines whether it faces strict scrutiny or a more deferential standard of review. *Id.* Severe restrictions on a plaintiff's rights require that the regulation be narrowly drawn to advance a compelling state

---

[14] In *Sarvis*, candidates for congressional offices and a political party filed suit against the SBE, seeking a declaratory judgment and injunctive relief regarding Virginia laws and practices that assign independent candidates and candidates from smaller parties a lower place on the ballot. 80 F. Supp. 3d at 696. The plaintiffs alleged that Virginia's laws violated the First and Fourteenth Amendments. *Id.* The *Sarvis* court granted the defendants' motion to dismiss, finding that Virginia's system passed constitutional muster. *Id.* at 709. Specifically, the *Sarvis* court determined that Virginia's reasons for the burden imposed by the challenged statute, avoiding voter confusion, party-order ballot symmetry, and favoring parties with demonstrated widespread support, were sufficiently weighty to justify the burden imposed. *Id.*

interest. *Id.* Modest burdens generally survive a challenge when the regulations advance an important state interest.[15] *Id.*

As discussed below, the Court finds that laches bars Plaintiffs' request for mandatory preliminary injunctive relief. *See infra* Part III. The Court declines to evaluate this case further under the *Anderson/Burdick* framework at this time.[16] Any discussion of Plaintiffs' likelihood to succeed on the merits, or the *Anderson/Burdick* framework, would veer toward improperly issuing an advisory opinion. The Court will address the merits of the statewide injunctive relief sought in the Complaint at a later procedural posture. *See Perry II*, 471 F. App'x at 224 ("We find it unnecessary to address whether Movant would likely succeed in his constitutional challenges because the district court was correct in concluding that the defense of laches bars the requested relief on the instant motion in any event.").

**C.    Laches**

"Laches is an equitable doctrine that precludes relief when a plaintiff has delayed bringing suit to the detriment of the defendant." *Perry v. Judd*, 840 F. Supp. 2d 945, 950 (E.D.

---

[15] During oral argument, the Plaintiffs contended that they presumed a rational basis test to "facilitate review on this motion." (Sept. 3, 2015 Prelim. Inj. Hr'g Tr. 24.)

[16] While the Court will not evaluate their arguments today, it notes for the record that the Plaintiffs generally allege unconstitutional discrimination against the right of local candidates to associate with their political party. Plaintiffs also argue that voter confusion could ensue in Powhatan given candidate Nordvig's change in political party affiliation. Plaintiffs do not allege facts supporting an inference of actual voter confusion in any other election, even those within Powhatan, other than Marcellus's race against Nordvig.

Among other things, the SBE responds that no constitutional violation flows because all local candidates are treated similarly to each other and because Section 24.2-613 serves the important regulatory interest of minimizing partisanship in local offices. The SBE also contends that the state law serves the important regulatory interest of attempting to ensure that as many citizens as possible are eligible to hold local office given Virginia's high number of federal employees who have limitations, under federal law, on the type of offices they may hold.

Va. 2012) ("*Perry I*"),[17] *aff'd, Perry II*, 471 F. App'x at 220; *see also Marshall v. Meadows*, 921 F. Supp. 1490, 1493–94 (E.D. Va. 1996).[18] "The doctrine applies with particular force in the context of preliminary injunctions against governmental action, where litigants try to block imminent steps by the government." *Perry I*, 840 F. Supp. 2d at 950. "Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public . . . projects do so with haste and dispatch." *Id.* (quoting *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989); citing *Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 100–01 (W.D. Va. 2007) (delay in bringing suit is a factor to be considered in granting preliminary relief); *Marshall*, 921 F. Supp. at 1494 ("The Fourth Circuit

---

[17] In *Perry I*, candidates seeking the Republican nomination for President of the United States challenged Va. Code Ann. § 24.2-545(B), which prohibited the use of out of state signature petition circulators. 840 F. Supp. 2d at 949; *see also Perry II*, 471 F. App'x at 221 ("[O]nly Virginia residents can serve as petition circulators for the purposes of a Virginia primary election campaign."). The candidates failed to qualify for inclusion on the primary ballot because they did not secure the requisite number of petition signatures. *Perry I*, 840 F. Supp. at 949. After receiving notice in December that they would not be included on the ballot for the March primary, the candidates sought a mandatory preliminary injunction to be listed on the ballot. *Id.* at 952. The plaintiffs argued that Virginia's limitation on who may circulate petitions restricted their right of free speech and association. *Id.* at 949. Plaintiffs contended that if they had been permitted to utilize out of state petition circulators, they could have garnered the required number of signatures. *Id.* at 952.

The *Perry I* court denied the motion for a preliminary injunction, finding that plaintiffs, who waited until a few weeks before the 45-day absentee ballot availability deadline to file suit, "slept on their rights to the detriment of the defendants." *Id.* at 952–53, 955 (noting that plaintiffs filed suit on December 27, 2011, approximately 17 days before local elections boards were instructed to begin mailing out absentee ballots for the March 2012 primary). The United States Court of Appeals for the Fourth Circuit subsequently denied plaintiff's request for an emergency injunction. *Perry II*, 471 F. App'x at 220. The *Perry II* court upheld the finding that laches barred the requested relief. *Id.* at 224.

[18] In *Marshall*, two members of a political party filed suit challenging Virginia's open primary law. 921 F. Supp. at 1491. In addition to finding that the plaintiffs lacked standing, the *Marshall* court concluded that laches barred their suit because the plaintiffs filed suit 95 days before the challenged primary was scheduled to take place. *Id.* at 1493–94. The *Marshall* court concluded that "the plaintiffs have slept on their rights . . . and that in consideration of the entire circumstances of the case, the plaintiffs are in laches." *Id.* at 1494.

is especially mindful of laches in the context of an impending vote.")).  The Fourth Circuit has

noted that applications for a preliminary injunction affecting ballot access have been

"consistently denied when they threaten to disrupt an orderly election."  *Perry II*, 471 F. App'x

at 227 (citation omitted).  Indeed, the Fourth Circuit has characterized the disapproval of

eleventh hour changes to an otherwise orderly election process as "not just caution lights to

lower federal courts; they are sirens."  *Id.* at 228.

"Laches is an affirmative defense to claims for equitable relief."  *Perry I*, 840 F. Supp.

2d at 953 (citing *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); *Envtl. Def. Fund, Inc. v.

Alexander*, 614 F.2d 474, 478 (5th Cir. 1980)).  The doctrine of laches "penalizes a litigant for

negligent or willful failure to assert his [or her] rights."  *Id.* (citations omitted).  Importantly for

this case, "[l]aches can serve as a defense to First Amendment claims."  *Id.* (citing cases).

Laches requires the proof of two elements:  (1) lack of diligence by the party against

whom the defense is asserted; and, (2) prejudice to the party asserting the defense.  *Id.* (citing

*Marshall*, 921 F. Supp. at 1493–94; *Costello v. United States*, 365 U.S. 265, 282 (1961); *White*,

909 F.2d at 102)).  The first element of laches, lack of diligence, means "the plaintiff delayed

inexcusably or unreasonably in filing suit."  *Id.* (quoting *White*, 909 F.2d at 102; citing *Baylor

Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1057 (5th Cir. 1985) (laches found where "delay is

not excusable"); *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir. 1966) (laches found

where "inexcusable or inadequately excused delay")).  "An inexcusable delay can only occur

after the plaintiff discovers or should have discovered the facts giving rise to his [or her] cause of

action."  *Id.* (quoting *Knox v. Milwaukee Cnty. Bd. of Elections Comm'rs,* 581 F. Supp. 399, 402

(E.D. Wis. 1984); *Ward v. Ackroyd*, 344 F. Supp. 1202, 1212 (D. Md. 1972)).

"The second element [of a laches defense] is prejudice to the defendant." *Id.* at 953–54 (citing *White*, 909 F.2d at 102). The defendant must prove that he or she has suffered a disadvantage or some other harm caused by reliance on the plaintiff's conduct. *Id.* at 954 (citing *White*, 909 F.2d at 102). "Prejudice can be inferred simply from the plaintiff's delay, or from evidence of specific harm." *Id.* (citation omitted). "The greater the delay, the less the prejudice required to show laches." *Id.* (citation omitted); *see Marshall*, 921 F. Supp. at 1494 ("Delay and prejudice are a compl[e]mentary ratio: the more delay demonstrated, the less prejudice need be shown.").

### III. Analysis

With these principles in mind, the Court turns to whether a preliminary injunction mandating the inclusion of Plaintiffs' political party affiliations next to their names on the November 3, 2015 General Election ballot should issue. The Court finds that laches bars Plaintiffs' request for a mandatory preliminary injunction. *Perry I*, 840 F. Supp. 2d at 954–55; *Marshall*, 921 F. Supp. at 1494. Plaintiffs demonstrate a lack of diligence by waiting until August 17, 2015 to file suit when they knew, certainly as of the time they received their nominations on May 21, 2015 and arguably even before given the age of the statute, that Section 24.2-613 would not permit the identification of their political party affiliations alongside their names on the ballot. Defendants also establish prejudice. The circumstances of this case do not allow for the extraordinary remedy of a mandatory preliminary injunction, and the Court will deny the Motion.

### A.   Plaintiffs' Lack of Diligence

Regarding the first element, the record reveals that Plaintiffs "delayed inexcusably or unreasonably." *Perry I*, 840 F. Supp. 2d at 953. The current version of Section 24.2-613 has

been in effect since January 1, 2001, over 14 years. *Compare* 2000 Va. Acts 514, *with* § 24.2-613. Plaintiffs received their nominations on May 21, 2015. At that moment, the law stated that the November 3, 2015 General Election ballot would not list their political party affiliations, and they have not established they could not have known the law.[19] Information the SBE displays on its website cannot supersede the operation of a Virginia statute in effect since January 1, 2001.

Despite their May nomination, Plaintiffs waited 88 days, until August 17, 2015, to file their Complaint. The August 17 filing date falls just 25 days prior to the September 11 ballot approval date, and 32 days prior to the absentee ballot availability deadline of September 18. Plaintiffs waited two weeks, despite the impeding election, after they say they learned of the issue on August 3. They delayed during the period, as discussed below, when ballot preparations already were underway statewide. *See infra* Part III.B. Such a delay is inexcusable and unreasonable under these circumstances of an approaching election and established ballot preparation deadlines.

Given these circumstances, Plaintiffs cannot sustain a request for a statewide mandatory preliminary injunction. The Fourth Circuit's admonition in *Perry II* regarding a plaintiff's delay

---

[19] Plaintiffs' claims otherwise do not persuade the Court. First, ignorance of the law does not generally excuse violative conduct. *See United States v. Moore*, 586 F.2d 1029, 1033 (4th Cir. 1978). Second, Marcellus's claim that "[i]t had not occurred," (Marcellus Decl. ¶ 33), to him that party affiliation would not be listed does not proffer cognizable evidence warranting the extraordinary remedy of mandatory, statewide, preliminary injunctive relief. Third, Marcellus's contention that he relied on the "What is on my Ballot" website does not convince. Even if the Court could not take judicial notice, as any person who has voted might, that the "What is on my Ballot" website does not *look* like a ballot, it nonetheless plainly references "Office," "Jurisdiction," "Ballot Name," "Party," and "Web Site" [sic] for each candidate. Plaintiffs -- even if they remain silent about having personally seen any local election ballots when they voted in the past -- cannot contend that actual ballots reference candidate websites. Moreover, by Marcellus's own admission, a fellow candidate thought that party affiliation might not be listed on the ballot. This does not excuse an 88 day delay in filing suit.

in bringing suit when the challenged statute has been in existence for a considerable period applies with equal force to Plaintiffs in this case:

> [Plaintiffs] had every opportunity to challenge [Section 24.2-613] at a time when the challenge would not have created the disruption that this last-minute lawsuit has. [Plaintiffs'] request contravenes repeated Supreme Court admonitions that federal judicial bodies not upend the orderly progression of state electoral processes at the eleventh hour. [Plaintiffs] knew long before now the requirements of Virginia's election laws. There was no failure of notice. The requirements have been on the books for years.

*Perry II*, 471 F. App'x at 220–21.

Plaintiffs state they tried to engage in some investigation regarding whether the November 3, 2015 General Election ballot would list their political party affiliations, suggesting that these investigative efforts should not be counted against them as unreasonable delay.[20] The *Marshall* court already has rejected a similar argument. *Marshall*, 921 F. Supp. at 1494. While the *Marshall* court found it "laudable" that the plaintiffs there waited to file suit until after prior efforts at change proved unsuccessful, it nonetheless concluded that the plaintiffs "ha[d] chosen the non-litigation path and must live with the consequences." *Id.*

These Plaintiffs must likewise live with the consequences of waiting until after receipt of the August 3, 2015 email rather than filing suit immediately upon receiving their nominations on May 21, 2015. Those "consequences" include that this Court lost valuable time during which it could have considered Plaintiffs' requested relief. *See id.* (noting that "time is now very short for this [c]ourt to fashion complete relief"). "If [this Court] were to find [Plaintiffs'] delay excusable, [this Court] would encourage candidates to wait until the last minute to bring constitutional challenges to state election laws." *Perry II*, 471 F. App'x at 225.

---

[20] For instance, Marcellus spoke to the Powhatan County General Registrar when he received his nomination in May. That official told Marcellus that information "would appear in a few days on [the SBE's] website." (2nd Marcellus Decl. ¶ 2.)

On this inexcusably delayed notice, the Court will not order a change to every local election ballot in the Commonwealth of Virginia. A delay of three months after they received their nominations, and two weeks after they say the August 3 email prompted action, cannot support injunctive relief. This Court received the Complaint roughly 32 days before the 45-day absentee ballot availability deadline and just 78 days before the 2015 General Election. Considering that the challenged statute has been in existence in its current form for over 14 years, the Court finds the delay in filing the suit at bar inexcusable and unreasonable. *See Perry I*, 840 F. Supp. 2d at 954 (finding laches barred challenge to Virginia election law when plaintiffs, who waited until mere weeks before the 45-day absentee ballot availability deadline to file suit, could have filed their challenge when the injury occurred months before); *Marshall*, 921 F. Supp. at 1491, 1494 (finding laches barred challenge to Virginia election law when plaintiff filed the lawsuit 95 days before the general election). Granting Plaintiffs the relief they seek after this inexcusable and unreasonable delay would impermissibly "upend the orderly progression of state electoral processes at the eleventh hour." *Perry II*, 471 F. App'x at 220–21.

### B.     Prejudice to Defendants

Regarding prejudice, the record before the Court shows that Plaintiffs' "lack of diligence clearly prejudiced the [Defendants], whose planning has been thrown into far greater confusion than would have been the case with a timely legal action." *Id.* at 226. Although "prejudice need not be so severe, where, as here, delay is conscious and substantial," *Marshall*, 921 F. Supp. at 1494, both the law and the facts before this Court establish that Defendants have suffered and will continue to suffer prejudice as a result of Plaintiffs' late request for a mandatory change to established and long-standing election procedures. Because Plaintiffs delayed unreasonably in challenging Section 24.2-613, Defendants and localities relied on the absence of any challenge

and acted according to the expectation that Section 24.2-613 would apply as usual in the November 3, 2015 General Election.

Importantly, "[b]allots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." *Perry II*, 471 F. App'x at 226. "[P]rinting ballots is complex and requires a number of technical steps to imbed information into the ballots themselves and to program computers to count them."[21] *Id.* "Challenges that come immediately before or immediately after the preparation and printing of ballots would be particularly disruptive and costly for state governments." *Id.* at 225.

"In order to promote fair and efficient elections, the [SBE] sets a timetable for localities to design ballots, order them from printers, proofread mock-ups, and mail them out." *Id.* at 226. "The 45-day [absentee ballot availability] requirement provides the [SBE] and localities with a tight window for getting ballots printed and mailed." *Id.* at 227. To meet the 45-day absentee ballot availability deadline, the SBE sets deadlines for localities to complete preparations for printing ballots, including receiving ballot approval. *Id.*; Stip. Fact ¶¶ 12–13.

---

[21] Defendants offer competent evidence about the complexity of the ballot preparation process. Defendants present testimony based on personal knowledge and facts otherwise admissible in evidence from officials preparing ballots for the 2015 General Election. First, they offer a declaration of Edgardo Cortes, the Commissioner of Elections for the Commonwealth of Virginia. Second, they offer the Declaration of Judy Flaig, the Elections Manager for Fairfax County. (Defs.' Opp'n Ex. D-5 Decl. Judy Flaig ("Flaig Decl.") ¶ 1, ECF No. 12-5.) Third, Defendants offer the Declaration of Donna Patterson, the General Registrar for the City of Virginia Beach. (Defs' Opp'n Ex. D-6 Decl. Donna Patterson ("Patterson Decl.") ¶ 1, ECF No. 12-6.)

Regarding the complexity of printing ballots, Patterson declares that working with the vendors who print the ballots involves the following: "[b]allot design is a detail-oriented process that involves several staff persons [in the office of the General Registrar] and personnel at [the commercial printer]. It is not unusual to go back and forth with the [printing] vendor multiple times about the ballot design as reviews occur and small errors are caught." (Patterson Decl. ¶ 10.) Plaintiffs, by contrast, offer no evidence specifically addressing the logistics of printing ballots via vendors.

17

As Virginia law allows, the ballot preparation process had well began statewide when

Plaintiffs filed suit. The Commissioner of Elections reports that, as of the close of business on

August 21, 2015, 4 days after Plaintiffs filed suit and 21 days before the September 11, 2015

approval deadline, 47 of the 133 electoral localities had already received approval to print their

ballots. (Cortes Decl. ¶ 6.) Most localities utilize a commercial printer to print their ballots. (*Id.*

¶ 12.)

Based on the sworn declarations of the general registrars from two of the 133 localities,

Fairfax County and the City of Virginia Beach, Defendants establish prejudice resulting from

Plaintiffs' delay. First, given the state of ballot preparations in Fairfax County, the injunction

requested would require the revision of the 76 ballot styles that will be used in the 241 voting

precincts in Fairfax County.[22]  Second, although Virginia Beach has not printed its ballots yet,

mandating changes to ballots to be used would prejudice Virginia Beach because it "would

require additional time and expense working with the [printing] vendor to revise the ballot styles

---

[22] Fairfax County has 241 voting precincts. Fairfax County prepared 76 unique ballot styles for use in the November 3, 2015 General Election, all of which use a bilingual format. On August 13, 2015, Fairfax County received ballot approval and, on August 17, 2015, sent the ballots to its printer. "Fairfax County regularly commences the ballot preparation and printing process in August, which has proven an appropriate and workable timeframe during [Flaig's] years of service as Elections Manager." (Flaig Decl. ¶ 10.)

Fairfax County expects to mail out approximately 1,000 absentee ballots on September 18, 2015. As of August 26, 2015, the printer had printed and shipped the absentee ballots approved for use in the November 3, 2015 General Election to the Fairfax County Office of Elections, approximately nine days after the printer received the ballots. Printing for the non-absentee ballots, totaling approximately 300,000 ballots, is roughly 1/3 complete. The non-absentee ballots are expected to ship in early September.

The cost of printing the ballots to be used in Fairfax County in the November 3, 2015 General Election was $94,118.50, not including shipping. Revising ballots at this stage would require modifications to each of the 76 styles and reprinting of ballots at a "significant cost." (*Id.* ¶¶ 15–16.) Adding political party affiliations next to candidate names could also create design issues and potentially require modifications regarding how candidate names are listed.

. . . [and] would delay printing."[23]   (Patterson Decl. ¶ 14.)  Notably, the General Registrar of Virginia Beach "cannot remember a prior election for which ballot modifications were required at this late date."  (*Id.*)

Further, any changes to ballots at this late stage would prove especially troublesome for this November 3, 2015 General Election due to the decertification of one of the most commonly used electronic voting machines in Virginia and the increased use of paper ballots.  On April 14, 2015, the SBE decertified the WinVOTE voting machine due to security vulnerabilities in the technology.  WinVOTE machines were previously one of the most widely used touchscreen voting machines in Virginia.  Decertification of the WinVOTE voting machine "has significantly increased the use of printed ballots" in Virginia.  (Cortes Decl. ¶ 16.)  For example, Virginia Beach will use all paper ballots in the November 3, 2015 General Election due to the replacement of its voting machine systems.

In an attempt to rebut Defendants' evidence of prejudice, Plaintiffs offered the sworn declaration of Cecil Jordan, "a member of the Powhatan County Electoral Board,"[24] who disagrees with Defendants' assessment.  (Pls.' Reply 4–5; *id.* Ex. P-2 Decl. Cecil Jordan ("Jordan Decl.") ¶ 2, ECF No. 13-2.)   Jordan believes adding political party affiliations to ballots would not require "reengaging in the ballot design process" and requires "no separate programming" of thumb drives used in voting machines.  (Jordan Decl. ¶ 8.)  Further, Jordan

---

[23] Virginia Beach has 99 precincts and 13 different ballot styles.  Virginia Beach has completed its ballot design process, and, as of August 27, 2015, is awaiting ballot approval. Virginia Beach expects it will take approximately two weeks for its commercial printer to print and return the ballots once they are approved.

[24] Jordan is not the Director of Elections for Powhatan County.

does not "anticipate" that changes to ballots would cause "delay[ ] beyond the September 18, 2015 deadline . . . for the distribution of absentee ballots."[25] (*Id.* ¶ 10.)

The Court finds that Defendants have established prejudice to Defendants statewide. Even were that not so, at a minimum, the conflict that exists among the election officials in Fairfax County, Virginia Beach, and Powhatan County regarding the ability to make changes to ballots at this stage of the election cannot undergird the "extraordinary remedy" of a mandatory preliminary injunction. *Perry II*, 471 F. App'x at 223. The evidence before the Court reflects

---

[25] Jordan emphasizes his computer acumen, but does not offer personal experience in developing election ballots in Powhatan County in the past, much less in other state municipalities. The facts offered by an affidavit or a sworn statement must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, a statement in an affidavit or sworn declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* The Court cannot find that Jordan's Declaration proffers competent testimony.

Jordan's Declaration relies on a review of some Virginia statutes and certain articles meant to "familiarize [himself] with changing technology." (Jordan Decl. ¶ 2.) While Jordan speculatively opines as to the effect of any change on Powhatan's ballot, he does not contend he has spoken with any vendor, or any state official, who has quantified any monetary or personnel impact. Nor does Jordan suggest he has been involved in preparing ballots.

Instead, Jordan critiques Defendants' Declarations. While he correctly notes that a full-stop character limitation for names on ballots may not exist, his other observations so lack factual clarity that this Court cannot find that he offers competent evidence. For instance, Jordan inexplicably states that Fairfax County does not have "76 different ballot styles," (Jordan Decl. ¶ 16), despite the fact that Exhibit B to the Cortes Declaration had attached the 76 ballot styles before Jordan swore out his Declaration. Plaintiffs conceded at the September 3, 2015 hearing that Jordan did not have personal experience regarding Fairfax County's ballot preparation procedures.

An examination of the 76 ballot styles to be used in Fairfax County reveals the unique nature of each of the 76 styles despite Jordan's claim otherwise. For example, the first style covers the Virginia Senate race in the 37th district, the Virginia House of Delegates race for the 39th district, and the Board of Supervisors race for the Braddock district. The second style covers the 37th district Virginia Senate race, (the same Senate race in the first style), the 41st district Virginia House of Delegates race, (a different House race than the race in the first style), and the Board of Supervisors race for the Braddock district, (the same race in the first style). The seventy-sixth style covers the 39th district Virginia Senate race, (a different race from either the first or second style), the 40th district Virginia House of Delegates race (a different race from either the first or second style), and the Board of Supervisors race for the Sully district, (a different race from either the first or second style).

that mandating the inclusion of political party information on the ballot statewide for the races excluded by Section 24.2-613 prejudices the SBE, the Department, and at least two localities.

Forcing the SBE, the Department, and at least Fairfax County and Virginia Beach to undertake and accomplish changes to ballots at this late stage in the electoral process "create[s] a risk that all affected localities will be unable to have modified ballots available" by the 45-day absentee ballot availability deadline.[26] (Cortes Decl. ¶ 15.) The Department would have to re-review and re-approve all the affected ballots from each of the 133 localities.[27] Localities such as Fairfax County which have already printed ballots and programmed voting machines would have to revisit their efforts. Because of the increased use of paper ballots in the November 3, 2015 General Election, the record before this Court presents concern about whether all 133 localities would be able to produce modified ballots in sufficient time.

Finally, Plaintiffs contend that localities which print ballots ahead of the September 11, 2015 approval deadline do so at their own risk, knowing they would be required to modify those ballots at any time up until the September 11, 2015 approval deadline. They suggest that another law anticipates last minute changes. Plaintiffs argue that, prior to the September 11, 2015 approval deadline, Section 24.2-612.1 requires that "every ballot must be changed if a candidate withdraws, dies, is disqualified or requests a change in how the candidate's name will appear on the ballot." (Pls.' Reply 3.)

_____

[26] The Court notes that party affiliation can be ascertained readily by other means. First, the candidates may campaign. Second, the SBE makes political party affiliation information available on its website. *See, e.g.*, Commonwealth of Va. Dep't of Elections List of Candidates 207–208 (Sept. 1, 2015, 9:43 AM), http://elections.virginia.gov/Files/CastYourBallot/CandidateList/2015GE-List_of_Candidates_By_Office_Locality.pdf

[27] The Court does not have information regarding each affected locality. However, the approved ballots for Fairfax County, Essex County, and the City of Colonial Heights each have races where political party affiliation information would have to be added.

Plaintiffs overplay their hand.  Section 24.2-612.1 expressly contemplates that the SBE may direct the affected locality to "provide notice to voters" regarding changes.  It does not uniformly mandate re-printing of ballots already printed.  § 24.2-612.1.  Moreover, common sense dictates that Section 24.2-612.1 was not enacted contemplating its implementation upon the "death, withdrawal, or disqualification" of every candidate in a local election less than one month prior to an absentee ballot approval deadline.

The record before this Court shows that Plaintiffs' lack of diligence prejudiced Defendants enough such that laches bars their extraordinary request for a mandatory preliminary injunction.  *See Perry I*, 840 F. Supp. 2d at 954 ("The filing of this suit . . . has changed the [SBE]'s careful scheduling into a chaotic attempt to get absentee ballots out on time.  This alone amounts to damage that satisfies the laches requirement.") (citing *Marshall*, 921 F. Supp. at 1494).  Plaintiffs have slept on their rights to the detriment of Defendants.

Considering the entire circumstances of this case, laches bars Plaintiffs' request for a mandatory preliminary injunction to include their political party affiliations next to their names on the ballot for the November 3, 2015 General Election.  Therefore, the Court DENIES the Motion for Preliminary Injunction.  *Cf. Perry II*, 471 F. App'x at 227–28.

### IV.  Conclusion

For the reasons stated above, this Court DENIES Plaintiffs' Motion for a Preliminary Injunction.  (ECF No. 3.)

An appropriate Order will follow.

/s/
M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 9-9-15

22